## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

| | | |
|---|---|---|
| MICHAEL WADDELL, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No. 2:21-cv-02229-JTF-atc |
| | ) | |
| JASON CLENDENION, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

## ORDER MODIFYING THE DOCKET, DENYING PETITION PURSUANT TO 28 U.S.C. § 2254, DENYING A CERTIFICATE OF APPEALABILITY, CERTIFYING THAT AN APPEAL WOULD NOT BE TAKEN IN GOOD FAITH, AND DENYING LEAVE TO PROCEED *IN FORMA PAUPERIS* ON APPEAL

Before the Court are the Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody (the "§ 2254 Petition, ECF No. 1"), filed by Petitioner Michael Waddell, Tennessee Department of Correction ("TDOC") prisoner number 510254, an inmate currently incarcerated at the Turney Center Industrial Complex ("TCIX") in Only, Tennessee; Respondent's Answer to Petition for Writ of Habeas Corpus ("Answer," ECF No. 14); and Petitioner's Reply to Answer to Petition for Writ of Habeas Corpus ("Reply," ECF No. 16).[1]   For the reasons stated below, the Court **DENIES** the § 2254 Petition.

---

[1] The Clerk shall record the respondent as TCIX Warden Christopher Brun.   *See* Fed. R. Civ. P. 25(d).   *See* https://www.tn.gov/correction/state-prisons/state-prison-list/turney-center-industrial-complex.html (last accessed Sept. 16, 2024).   The Clerk shall terminate all references to Jason Clendenion as the respondent.

## I.    STATE COURT PROCEDURAL HISTORY

On November 19, 2009, a grand jury in Shelby County, Tennessee returned an indictment charging Petitioner with second degree murder for "unlawfully and knowingly" killing Shayla Harris[2] in violation of Tenn. Code Ann. § 39-13-210.   (ECF No. 11-1 at PageID 54-55.)   On May 25, 2012, the jury returned a guilty verdict on the second degree murder charge.   (*Id.* at PageID 61.)   On June 25, 2012, the trial court sentenced Petitioner as a Range II, multiple offender to thirty-seven (37) years in prison.   (*Id.* at PageID 76.)

On August 22, 2012, Petitioner filed a notice of appeal.   (*Id.* at PageID 82.)   Petitioner argued that the evidence was insufficient to sustain the second degree murder conviction.   (ECF No. 11-12 at PageID 816-18.)   On December 18, 2013, the Tennessee Court of Criminal Appeals ("TCCA") affirmed the trial court.   (ECF No. 11-14.)   *See State v. Waddell*, No. W2012-01910-CCA-R3-CD, 2013 WL 6706088, at *1, 8 (Tenn. Crim. App. Dec. 18, 2013), *perm. app. denied* (Tenn. May 15, 2014).   On May 15, 2014, the Tennessee Supreme Court ("TSC") denied the application for permission to appeal.   (ECF No. 11-17.)

On December 15, 2014, Petitioner filed a *pro se* Petition for Post Conviction Relief in the Shelby County Criminal Court.   (ECF No. 11-18 at PageID 882-92.)   Counsel was appointed. (*Id.* at PageID 893.)   An amended petition was filed on April 21, 2017.   (*Id.* at PageID 894-96.) A second amended petition was filed on June 6, 2017.   (*Id.* at PageID 898-900, 902-10.)   Post-conviction hearings were held on April 21, 2017, September 29, 2017, and June 29, 2018.   (ECF Nos. 11-19 through 11-21.)   The post-conviction court denied relief on September 14, 2018.

---

[2] The indictment names the victim as Shelia Harris.   (ECF No. 11-1 at PageID 54.)   The state court opinions refer to the victim as "Shayla Harris."   For consistency, the Court will refer to the victim as Shayla Harris.

(ECF No. 11-18 at PageID 913-29.)   On October 9, 2018, Petitioner appealed.   (ECF No. 11-23.)
On April 23, 2020, the TCCA affirmed.   *See Waddell v. State*, No. W2018-01853-CCA-R3-PC,
2020 WL 1966324, at*1 (Tenn. Crim. App. Apr. 23, 2020).   The TSC denied permission to appeal
on August 11, 2020.   (*See* ECF No. 11-29.)

## II.   THE EVIDENCE

The TCCA summarized the evidence at trial as follows:

The [Petitioner's] conviction resulted from the death of Shayla Harris, who was the
victim of a shooting by the [Petitioner].   At trial, Clarence Scott, IV, testified that
he lived at 2753 Browning Street, near Joslyn Clemmons, who was the victim's
aunt.   Scott had known the [Petitioner] for several years and had bought drugs from
him.   Before dark on the evening of June 30, 2009, Scott was in his house smoking
crack cocaine with some friends when the [Petitioner] and the [Petitioner's] brother,
Felt, came to the house.   The [Petitioner] told Scott "'can't nobody else sell drugs
on the street.'"   Felt demanded that Scott pay him, then he and the [Petitioner] told
Scott to leave the house and get the money.   Because both men had pistols, Scott
left the house.   He saw the victim and her boyfriend, Aubrey Lynn Taylor, sitting
in a car in the driveway.

Scott said that he went to his parents' house next door and stood in front of the
residence.   After the [Petitioner] and Felt left, Scott returned to his house.   The
victim and Taylor were still in the driveway.   Three to five minutes later, Scott
heard the victim and Taylor start their car and drive away.   Approximately five
minutes later, Scott heard a gunshot.   He looked out his front door but did not see
who had been shot.   However, he saw Taylor "jumping and hollering" and saw the
[Petitioner] running away.   Shortly thereafter, the police arrived and secured the
scene.

On cross-examination, Scott said that he used, but did not sell, drugs.   Scott
acknowledged that on the day of the shooting he had smoked crack cocaine for at
least six to eight hours, but he maintained that he "wasn't that cloudy."

Scott said that he knew the victim had been shot when he saw Taylor "running back
and forth shouting 'he shot my baby.'"   Scott did not see an altercation between
the victim and the [Petitioner].

Joslyn Clemmons testified that she lived at 2738 Browning Street and that the
[Petitioner] lived in a rooming house approximately four houses down the street
from her.   She described the [Petitioner] as "a violent type guy."

3

[Ms. Clemmons] said that on June 30, 2009, she saw the [Petitioner] "practically throughout the day ranting and raving, ranting and raving up and down the street ... [c]ussing and fussing at everyone, anyone."   At approximately 3:30 or 4:00 p.m., the victim, who was driving a white, 2003 Chevrolet Malibu, came to visit her. [Ms. Clemmons'] nephew, Antoine; her son, Eric; her three-year-old grandson; and the victim's friend, Penny, were also at the house.   [Ms. Clemmons] looked outside and saw the [Petitioner's] brothers, Eric and Felt.   The [Petitioner] was standing down the street in the yard of a house that had burned, and a blue, four-door Cadillac was parked in the grass.   A woman and two or three children were with the [Petitioner] and his brothers.

[Ms. Clemmons] said that the victim left the house to drive her mother to work and returned thirty or forty-five minutes later.   The victim's boyfriend, Taylor, was with her, and they parked in [Ms. Clemmons'] driveway.   When they arrived, [Ms. Clemmons] was standing at the front door.   The [Petitioner] was wandering the street near [Ms. Clemmons'] driveway, "ranting and raving, waving a gun." [Ms. Clemmons] told the [Petitioner] to get away from her house and that she was going to call the police.   When she picked up the telephone to call 911, the [Petitioner] raised his gun.   [Ms. Clemmons] said, "[D]on't you do that, Mike." The [Petitioner] disregarded her statement, "raised that gun up and put that gun in [the victim's] face and shot [the victim]."   The [Petitioner] said, "'I didn't like that bitch no way.'"

[Ms. Clemmons] said that after the shooting, the [Petitioner], his brother, the woman, and the children got into the Cadillac and drove away, running over curbs and garbage cans.   [Ms. Clemmons] did not see Antoine [Clemmons] or the victim have any interaction with the [Petitioner].

On cross-examination, [Ms. Clemmons] said that the shooting occurred at night while it was dark.   A streetlight was by the curb across the street, and her next door neighbor had a bright light on a pole at the end of his driveway.

[Ms. Clemmons] acknowledged that in her statement to the police, she initially said that she did not see "him" with a gun.   She explained that she "was just mad and wanted to get out [of] the police station because I was so mad I wanted to kill him myself."   She denied that she would lie in order to mislead the jury.

On redirect examination, [Ms. Clemmons] clarified that when she told the police that she did not see "him" with a gun, she was referring to the [Petitioner's] brother Eric, not the [Petitioner].   After reviewing her statement, she recalled that she told the police she saw the [Petitioner] with a "big gray looking gun, gray, silver/grayish, a fat gun" and that she saw him shoot the victim with that gun.

Antoine Clemmons, the victim's older brother, testified that he arrived at [Ms. Clemmons'] house around 9:00 p.m. so that the victim could drive him to his

4

mother's house.   When he arrived at the residence, [Ms. Clemmons], Penny, [Ms. Clemmons'] son, and [Ms. Clemmons'] grandson were in the yard.   Gladys Mitchell, a neighbor who lived to the right of [Ms. Clemmons], was on her porch with Bernard Clemmons, Steve Lloyd, and Felt.   The [Petitioner] was in Mitchell's yard.   [Mr. Clemmons] said that he had no contact with the [Petitioner] at that time.

[Mr. Clemmons] said that approximately thirty-five minutes to one hour later, the victim and Taylor came to [Ms. Clemmons'] house.   Taylor was driving the victim's Malibu.   When they arrived, [Mr. Clemmons] was sitting on [Ms. Clemmons'] porch with Penny, and [Ms. Clemmons] was standing in the doorway. The victim asked [Ms. Clemmons] if he was ready to leave.   He said yes and walked off the porch.   When [Mr. Clemmons] reached the end of the driveway, the [Petitioner approached him, carrying a chrome and black semiautomatic Glock pistol in his hand.   The [Petitioner] pushed [Mr. Clemmons] and said, "[W]hat you trying to do to me, you're trying to do something to me, trying to work up on me or something to that sort."   [Mr. Clemmons] asked the [Petitioner] what was wrong, told him to "chill," and cautioned the [Petitioner] not to do something he would regret.

[Mr. Clemmons] said that as he and the [Petitioner] talked, they walked down the street away from [Ms. Clemmons'] house.   When [Mr. Clemmons] arrived at a neighbor's porch "two doors down," he turned around and noticed the [Petitioner] was near the front of [Ms. Clemmons'] yard.   A fight "broke out" between the [Petitioner] and the victim, with both individuals "swinging" punches.   The [Petitioner] used both hands to strike the victim.   [Mr. Clemmons] said that the victim was "throwing blows" at the [Petitioner] to defend herself.   During the fight, [Mr. Clemmons] saw the [Petitioner] fire the Glock in the victim's face. [Mr. Clemmons] began running toward the fight, and saw the victim fall to the curb. The [Petitioner] stood in place "like in disbelief," saying nothing.   [Mr. Clemmons] grabbed the victim, saw that she was bleeding, but could not tell where she was injured.   The [Petitioner] left before the police arrived.

On cross-examination, [Mr. Clemmons] said that he did not know whether the [Petitioner] and the victim were "having words as they [were] fighting."   [Mr. Clemmons] acknowledged that he said in his statement to the police:

> "I was sitting on the porch when [the victim and Taylor] approached me and asked if I was ready to go home for the night.   The shooter took in content that something was being said to him and it was not.   By then I leave the porch and walked out towards the fence and he pushes me."

[Mr. Clemmons] said that he saw the [Petitioner] strike the victim several times in the face with the gun before the [Petitioner] fired the gun.   [Mr. Clemmons] told the police that he was not sure if the [Petitioner] "was trying to shoot over [the victim's] head to scare her."

[Mr. Clemmons] stated that he and the [Petitioner] had been close friends prior to this incident.  He said that before the victim got out of her car, he heard [Ms. Clemmons] and the [Petitioner] "have words with each other." [Mr. Clemmons] said, "Whatever caused them to be in a physical fight I don't know, but I know [the victim] wouldn't have not proceeded to do anything to him unless done upon."

On redirect examination, [Mr. Clemmons] said that he told the police that the [Petitioner] "'took the pistol and cocked it and swung it at her, then swung it again and pointed it at her face and squeezed the trigger.  I don't know if he was trying to shoot over her head but he shot her.'"   [Mr. Clemmons] also told the police that the [Petitioner] "'couldn't have been trying to shoot her over the head because he aimed at her face and pulled the trigger and walked off.'"   [Mr. Clemmons] said that the [Petitioner] intended to shoot the victim and that the [Petitioner] walked away without saying anything after the shooting.

On recross-examination, [Mr. Clemmons] said that the [Petitioner] and the victim fought for twenty or thirty seconds.   He acknowledged that he did not see anything that would have prevented either the victim or the [Petitioner] from retreating.

*Waddell*, 2020 WL 1966324, at *1-3.

## III.    THE LEGAL STANDARD

Where a claim has been adjudicated on the merits in state court, the writ is only granted if the adjudication:

(1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2).   The petitioner carries the burden of proof for this "difficult to meet" and "highly deferential [AEDPA] standard," which "demands that state-court decisions be given the benefit of the doubt."   *Cullen v. Pinholster*, 563 U.S 170, 181 (2011) (quoting *Harrington v. Richter*, 562 U.S. 86, 102 (2011), and *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam)).

Review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits. *Pinholster*, 563 U.S. at 181-82, 185.

A state court's decision is "contrary" to federal law when it "arrives at a conclusion opposite to that reached" by the Supreme Court on a question of law or "decides a case differently than" the Supreme Court has "on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 41213 (2000).[3]  An "unreasonable application" of federal law occurs when the state court "identifies the correct governing legal principle from" the Supreme Court's decisions "but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.  The state court's application of clearly established federal law must be "objectively unreasonable" for the writ to issue. *Id.* at 409.  The writ may not issue merely because the habeas court, in its independent judgment, determines that the state court decision applied clearly established federal law erroneously or incorrectly. *Renico v. Lett*, 559 U.S. 766, 773 (2010) (citing *Williams*, 529 U.S. at 411).  "As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103.

As for challenges under §2254(d)(2), "when a federal habeas petitioner challenges the factual basis for a prior state-court decision rejecting a claim, . . . [t]he prisoner bears the burden of rebutting the state court's factual findings 'by clear and convincing evidence.'" *Burt v. Titlow*, 571 U.S. 12, 18 (2013) (quoting 28 U.S.C. § 2254(e)(1)).  A state court factual determination is

---

[3] The "contrary to" standard does not require citation of Supreme Court cases "so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam).

not "unreasonable" merely because the federal habeas court would have reached a different conclusion.  *Wood v. Allen*, 558 U.S. 290, 301 (2010); *see also Rice v. Collins*, 546 U.S. 333, 341-42 (2006) ("Reasonable minds reviewing the record might disagree" about the factual finding in question, "but on habeas review that does not suffice to supersede the trial court's . . . determination.").[4]   The Supreme Court has described this standard as "demanding but not insatiable" and has emphasized that "deference does not by definition preclude relief."  *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) (internal quotation marks and alteration omitted).

## IV.   WADDELL'S § 2254 PETITION

On April 12, 2021, Petitioner filed the § 2254 Petition.  (ECF No. 1.)   The issues presented are:

1.     The evidence was insufficient for second degree murder because the proof established that the victim was the first to attack and there is no evidence that Petitioner knowingly killed the victim, due to the adequate provocation of a heated fight.  (*Id.* at PageID 4.)   The state court's decision was unreasonable and contrary to federal law.  (*Id.*)

2.     Petitioner's trial counsel erred when: (a) cross-examining key prosecution witness Antoine Clemmons by not asking him about his prior inconsistent statements that the shooting was not intentional; (b) counsel failed to preserve the error for direct appeal; and (c) counsel failed to call Vida Bailey and Montrell Garrett as defense witnesses.  (*Id.* at PageID 6.)   The state court's application of *Strickland* was unreasonable.  (*Id.*)

---

[4]     In *Wood*, the Supreme Court granted certiorari to resolve whether, to satisfy § 2254(d)(2), "a petitioner must establish only that the state-court factual determination on which the decision was based was "'unreasonable,'" or whether § 2254(e)(1) additionally requires a petitioner to rebut a presumption that the determination was correct with clear and convincing evidence."  *Wood*, 558 U.S. at 299.   The Court ultimately found it unnecessary to reach that issue, and left it open "for another day."  *Id.* at 300-01, 303 (citing *Rice*, 546 U.S. at 339, in which the Court recognized that it is unsettled whether there are some factual disputes to which § 2254(e)(1) is inapplicable). In *Burt*, 571 U.S. at 18, the Supreme Court applied § 2254(e)(1)'s "clear and convincing" standard but cautioned that "[w]e have not defined the precise relationship between § 2254(d)(2) and § 2254(e)(1), and we need not do so here."

The Court issued an order on October 27, 2021, directing the Warden to file the state-court record and a response.   (ECF No. 6.)   The Warden filed the state-court record on January 21 and 25, 2022, and his Answer on January 28, 2022.   (ECF No. 14.)   On April 4, 2022, Petitioner filed a Reply.   (ECF No. 16.)

## V.   ANALYSIS OF PETITIONER'S CLAIMS

Respondent asserts that Petitioner's claims of insufficient evidence and ineffective assistance of counsel should be denied on the merits.   (ECF No. 14 at PageID 1175.)

### A.  Sufficiency of the Evidence

Petitioner asserts that the evidence was insufficient to establish second degree murder because Harris attacked Petitioner first and because there was adequate provocation from a heated fight, making the incident voluntary manslaughter instead of second degree murder.   (*See* ECF No. 1 at PageID 4.)

On direct appeal, the TCCA opined,

On appeal, a jury conviction removes the presumption of the appellant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. *See State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).   The appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt.   *See Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L.Ed.2d 560 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom.   *See State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983).   In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts.   *See State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990).

The guilt of a defendant, including any fact required to be proved, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence.   *See State v. Pendergrass*, 13 S.W.3d 389,

392–93 (Tenn. Crim. App. 1999). Even though convictions may be established by different forms of evidence, the standard of review for the sufficiency of that evidence is the same whether the conviction is based upon direct or circumstantial evidence. *See State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

The appellant complains that the proof at trial established that he committed voluntary manslaughter, not second degree murder. Specifically, the appellant contends that "[g]iven the fact that a physical fight had broken out between [the appellant] and [the] victim prior to the shooting, no rational trier of fact could have found that the killing lacked the state of passion that resulted from the adequate provocation of a heated fight."

Second degree murder is defined, in pertinent part, as the "knowing killing of another." Tenn. Code Ann. § 39–13–210(a)(1). Voluntary manslaughter, which is a lesser included offense of second degree murder, is "the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Tenn. Code Ann. § 39–13–211(a). The principal distinction between the two crimes for purposes of this appeal is the existence of adequate provocation.

Viewing the evidence in the light most favorable to the State, the proof adduced at trial is sufficient to establish that the appellant committed second degree murder. Specifically, the state's proof at trial was that on the day of the shooting, the appellant was angry because someone else was selling drugs on Browning Street, which he considered his area. The appellant and his brother went to Scott's house armed with pistols and demanded money, asserting that "can't nobody sell drugs on the street." Shortly before the victim was shot, the appellant was walking up and down the street, "ranting and raving," and waving a gun. Antoine Clemmons, the victim's brother, testified that he was at his mother's house when the victim and her boyfriend, Aubrey Lynn Taylor, arrived in the victim's Chevrolet Malibu. The victim planned to drive Antoine to work. Antoine walked from the porch to the end of the driveway, and the appellant approached him with a semiautomatic Glock pistol and pointed the gun at Antoine. Antoine cautioned the appellant to not do something he would regret, and the two walked down the street. The appellant turned around and walked back toward the victim's car. The appellant argued with the victim, and the two began fighting. Antoine testified that the appellant struck the victim in the face with the gun several times then pointed the gun at the victim's face, cocked the gun, and shot her. Afterward, the appellant walked away.

Joslyn Clemmons, the victim's aunt, witnessed the shooting. Joslyn told the appellant to get away from her house and picked up the telephone to call the police. The appellant raised the gun, and Joslyn admonished him, "Don't you do that, Mike." Despite her warning, the appellant raised the gun, put the gun in the victim's face, and shot her. The appellant said, "I didn't like that bitch no way," and walked away.

10

> Taylor testified that the victim and the appellant had been fighting but that the fighting had ceased when the appellant cocked his gun and shot the victim in the face.
>
> The appellant maintains that Gladys Mitchell's testimony that the victim started the fight and that she provoked the shooting established that the appellant killed the victim while in a state of passion after reasonable provocation.   However, the jury heard the proof and rejected that defense theory.   "Whether the acts constitute a 'knowing killing' (second degree murder) or a killing due to 'adequate provocation' (voluntary manslaughter) is a question for the jury."   *State v. Johnson*, 909 S.W.2d 461, 464 (Tenn. Crim. App. 1995); *see also State v. Williams*, 38 S.W.3d 532, 538 (Tenn. 2001).   We defer to the finder of fact's evaluation of the evidence and its determination regarding the existence of adequate provocation.   *See, e.g., Johnson*, 909 S.W.2d at 464.   There is no reason for us to second-guess the jury's decision because the evidence is sufficient to support the verdict.

*Waddell*, 2013 WL 6706088, at *7-8.

Respondent emphasizes that, under *Coleman v. Johnson*, 566 U.S. 650, 651 (2012) (per curiam), there are two layers of deference applied in habeas proceedings to a sufficiency of evidence claim: (1) that Petitioner must show no rational trier of fact could have agreed with the jury; and (2) that the state court's decision must be objectively unreasonable to be overturned. (ECF No. 14 at PageID 1191.)   Relying on *State v. Williams*, 38 S.W. 3d 532, 539 (Tenn. 2001), Respondent argues that the distinguishing element between second degree murder and voluntary manslaughter is whether the killing was committed "in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner."   (*Id.* at PageID 1192.)   Respondent noted Petitioner's reliance on Mitchell's testimony to show that the homicide was voluntary manslaughter and the TCCA's deference to the jury's evaluation of the evidence and its determination that there was not adequate provocation, which led to a finding of second degree murder.   (*Id.* at PageID 1193.)

11

Respondent argues that the TCCA's determination of facts was reasonable.   (*Id.*) Respondent points to record evidence that multiple witnesses saw Petitioner with a weapon on the day of the shooting, that Petitioner and Harris had a physical altercation during which Petitioner shot Harris, and that Harris died from a gunshot wound at intermediate range, after which Petitioner said, "I didn't like that bitch no way" and left.   (*Id.*)   Respondent asserts that the jury was instructed on the distinction between second degree murder and voluntary manslaughter.   (*See* ECF No. 11-2 at PageID 85-86; *see* ECF No. 14 at PageID 1194.) Respondent argues that the Court must not reweigh the evidence or reevaluate the credibility of witnesses to resolve the issue of adequate provocation.   (*Id.*)   Respondent contends that the TCCA's decision is a "reasonable conclusion supported by the record and a reasonable application of *Jackson*."   (*Id.*)

Turning now to this Court's analysis.   A challenge to the sufficiency of evidence addresses whether "the government's case was so lacking that it should not have even been submitted to the jury."   *Musacchio v. United States*, 577 U.S. 237, 243 (2016) (internal quotation marks omitted). "[A] reviewing court makes a limited inquiry tailored to ensure that a defendant receives the minimum that due process requires: a 'meaningful opportunity to defend' against the charge against [her] and a jury finding of guilt 'beyond a reasonable doubt.'"   *Id.* (quoting *Jackson*, 443 U.S. at 314–15).   The habeas court asks only "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."   *Jackson*, 443 U.S. at 319 (emphasis in original).

This standard requires a federal district court to examine the evidence in the light most favorable to the State.   *Id.* at 326.   And, in doing so, a federal habeas court may not intrude on the trier of fact's role "to resolve conflicts in the testimony, to weigh the evidence, and to draw

12

reasonable inferences from basic facts to ultimate facts." *Id.* at 319.   Sufficiency of evidence

claims "face a high bar in federal habeas proceedings because they are subject to two layers of

judicial deference." *Coleman*, 566 U.S. at 651.   First, on direct appeal, the reviewing court defers

to the trier of fact, and second, on habeas review, "a federal court may not overturn a state court

decision rejecting a sufficiency of the evidence challenge simply because the federal court

disagrees with the state court." *Id.* (internal quotation marks omitted).   The federal habeas court

may overturn the state court's rejection of such a claim, only if the state court's decision was

"objectively unreasonable." *Id.* (citation omitted).

On direct appeal, the TCCA correctly cited *Jackson* as the applicable Supreme Court

precedent. *See Waddell*, 2013 WL 6706088, at *7.   Next the TCCA identified the elements of

second degree murder and voluntary manslaughter under Tennessee law. *Id.*   The court then

summarized the relevant evidence in the light most favorable to the State, noting that Petitioner

was angry because someone was selling drugs on the street, which he considered his area; went

armed with pistols with his brothers into a house demanding money from the people inside; had

been walking the street, ranting and raving, and waving a gun; had struck the victim in the face

with the gun several times; then cocked the gun and shot her; and said "I didn't like that bitch no

way" before leaving. *Id.* at *7-8.   The TCCA emphasized that the jury heard and *rejected*

Mitchell's testimony as evidence of adequate provocation. *Id.* at *8.

Based on this Court's review of the trial transcripts, the TCCA reasonably concluded that

the State presented sufficient evidence to support Petitioner's conviction.   The testimony and

other evidence presented at trial permitted a rational trier of fact to find Petitioner guilty of second

degree murder.   Given the deference due to the jury, as the trier of fact, and the TCCA, this Court

finds that the TCCA's decision was not contrary to or an unreasonable application of *Jackson* and

that the TCCA did not base its decision on an unreasonable determination of the facts given the evidence.   The Court therefore **DENIES** Petitioner's sufficiency of evidence claim.

### B. Ineffective Assistance of Counsel

Petitioner asserts that his trial counsel failed to cross-examine Antoine Clemmons, Harris's brother, about his prior inconsistent statements that the shooting was not intentional, preserve the error for direct appeal, and call Vida Bailey and Montrell Garrett as defense witnesses to discredit Antoine.[5]   (ECF No. 1 at PageID 6.)   Petitioner argues that Bailey heard Antoine tell Petitioner's brothers that Antoine "felt in his heart that it was an accident" and that defense counsel should have given Antoine the opportunity to address his inconsistent statements about Petitioner's intent. (ECF No. 16 at PageID 1204.)

Petitioner argues that it is reasonably probable that Antoine could have recanted the testimony that Petitioner said, "I didn't like that bitch no way."   (*Id.* at PageID 1205.)   Petitioner contends that Antoine was the main witness and that a determination of Petitioner's intent was dependent entirely on Antoine's testimony.   (*Id.* at PageID 1205, 1208.)   Petitioner asserts that Antoine's inconsistent statements could have been impeaching, regardless of the testimony of other eyewitnesses, specifically Taylor and Josyln.   (*Id.* at PageID 1205, 1207.)

Petitioner's claims that his attorney rendered ineffective assistance are controlled by the standards stated in *Strickland v. Washington*, 466 U.S. 668 (1984).   Those standards require a showing that "counsel's performance was deficient" and that "the deficient performance prejudiced the defense."   *Id.* at 687.   To establish deficient performance, a person challenging a conviction "must show that counsel's representation fell below an objective standard of

---

[5] Because Antoine Clemmons and Joslyn Clemmons were witnesses at trial, the Court will refer to them by their first names.

reasonableness." *Id.* at 688.   "A court considering a claim of ineffective assistance must apply a strong presumption that counsel's representation was within the wide range of reasonable professional assistance.   The challenger's burden is to show that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Harrington*, 562 U.S. at 104 (internal quotation marks and citations omitted).   To demonstrate prejudice, a prisoner must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

The deference to be accorded a state-court decision under *Strickland* is magnified when reviewing an ineffective assistance claim under 28 U.S.C. § 2254(d):

> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult.   The standards created by *Strickland* and § 2254(d) are both "highly deferential," *id.*, at 689; *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7 (1997), and when the two apply in tandem, review is "doubly" so, *Knowles* [*v. Mirzayance*], 556 U.S., at 123, 129 S. Ct. at 1420 [(2009)].   The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at 123, 129 S. Ct. at 1420.   Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d).   When § 2254(d) applies, the question is not whether counsel's actions were reasonable.   The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Harrington*, 562 U.S. at 105.

Petitioner's trial counsel recalled Antoine's testimony that Petitioner intentionally shot Harris.   *Waddell*, 2020 WL 1966324, at *4.   Petitioner's counsel asked Antoine whether he made specific statements to anyone about the shooting or Petitioner's state of mind.   *Id.*   Counsel attempted to call Bailey to testify that Antoine told her that the shooting was an accident.   *Id.* However, the trial court excluded Bailey's testimony under Tenn. R. Evid. 613(b) because Antoine had not had an opportunity to explain his inconsistent statements.   *Id.*   The issue was not raised

in the motion for new trial, and appellate counsel did not raise the claim because, by doing so, he would have waived the right to present the ineffective assistance claim in the post-conviction proceedings.  *Id.*

At the post-conviction hearing, Antoine, trying to reconcile why his friend killed his sister, testified about the shooting,

> "I said that I don't feel it was intentionally, but he did it.   That was my statement."
> . . .   "What I'm saying is it wasn't an accident, but to me, I feel like he wasn't trying to do it on purpose.   That was my initial statement, same thing."   . . .   "[I]t was intentional, but to me he didn't mean it.   You understand what I'm saying."

*Id.*

Antoine did not recall discussing the shooting with Bailey or Garrett or with anyone outside the court.  *Id.* at *5.   Antoine acknowledged that he told police Petitioner "took a pistol and cocked it and swung it at [Harris], and then pointed it at her face and pulled the trigger.  He couldn't have been trying to shoot over her head because he aimed it at her face and then walked off."  *Id.*

At the post-conviction hearing, Bailey testified that Antoine came to her house when Petitioner's brothers and two other neighbors were there and that she "overheard [Antoine] crying and saying that he loved and missed his sister" and that "[h]e felt in his heart that it was an accident."  *Id.*

Garrett is the father of Petitioner's sister's child.  *Id.*   Garrett testified that Antoine and Petitioner's brothers were at Marcus Dunlap's house and Antoine said it "was like it was all a[n] accident and it's still love and he was hugging both of the [Petitioner's] brothers."  *Id.*

Denying relief, the post-conviction court said,

> that Mr. Clemmons testified at trial that the Petitioner pointed the gun at the victim's face then pulled the trigger; therefore, the court "could not see how it

would be possible that Mr. Clemmons could know whether or not the shooting was an accident, because he would have no way of knowing the [P]etitioner's intent at the time he pulled the trigger." The post-conviction court noted that Mr. Clemmons testified on cross-examination that he told the police that the Petitioner "may have only been intending to shoot over the victim's head to scare her, ... and so this information was already placed before the jury."[6]

*Id.*   (*See* ECF No. 11-18 at PageID 922.)

On post-conviction appeal, the TCCA opined,

The Petitioner contends that the post-conviction court erred by holding that trial counsel was not ineffective when he failed to impeach Mr. Clemmons with prior inconsistent statements because the failure precluded counsel from calling Ms. Bailey and Mr. Garrett to testify regarding the statements. The State argues that the post-conviction court properly denied the petition. We agree with the State.

To be successful in a claim for post-conviction relief, the Petitioner must prove the factual allegations contained in the post-conviction petition by clear and convincing evidence. *See* Tenn. Code Ann. § 40-30-110(f). "'Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" *State v. Holder*, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999) (quoting *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992)). Issues regarding the credibility of witnesses, the weight and value to be accorded their testimony, and the factual questions raised by the evidence adduced at trial are to be resolved by the post-conviction court as the trier of fact. *See Henley v. State*, 960 S.W.2d 572, 579 (Tenn. 1997). Therefore, the post-conviction court's findings of fact are entitled to substantial deference on appeal unless the evidence preponderates against those findings. *See Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001).

A claim of ineffective assistance of counsel is a mixed question of law and fact. *See State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). We will review the post-conviction court's findings of fact de novo with a presumption that those findings are correct. *See Fields*, 40 S.W.3d at 458. However, we will review the post-conviction court's conclusions of law purely de novo. *Id.*

When the Petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, "the [P]etitioner bears the burden of proving both that counsel's performance was deficient and that the deficiency prejudiced the defense." *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996) (citing *Strickland v.*

---

[6] The jury was instructed on criminally negligent homicide and reckless homicide as lesser included offenses. (*See* ECF No. 11-2 at PageID 84-85, 88.) However, the jury was not convinced that either was an appropriate charge.

*Washington*, 466 U.S. 668, 687 (1984)).   To establish deficient performance, the Petitioner must show that counsel's performance was below "the range of competence demanded of attorneys in criminal cases."   *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975).   To establish prejudice, the Petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.   A reasonable probability is a probability sufficient to undermine confidence in the outcome."   *Strickland*, 466 U.S. at 694.   Moreover,

> [b]ecause [the P]etitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim.   Indeed, a court need not address the components in any particular order or even address both if the [Petitioner] makes an insufficient showing of one component.

*Goad*, 938 S.W.2d at 370 (citing *Strickland*, 466 U.S. at 697).

In the instant case, the post-conviction court noted that Mr. Clemmons, who was

> the older brother of the victim, but also a friend of the [P]etitioner and his brothers, was an extremely ambivalent witness for the State to begin with regarding the intent of the [P]etitioner when he shot the victim, only testifying to what he saw, not what he thought.   He was impeached by the [P]etitioner's trial attorney to some extent by his prior statement to the police that he was not sure if the [Petitioner] might have been trying to shoot over the victim's head to scare her.

The post-conviction court further noted that in excluding the testimony of Ms. Bailey, the trial court found it was not possible Mr. Clemmons "could know whether or not the shooting was an accident, because he would have no way of knowing the [P]etitioner's intent at the time he pulled the trigger." The post-conviction court stated:

> Everything that Mr. Clemmons saw was thoroughly explored in his direct and cross[-]examination during trial.   Any opinion that he might have expressed to the brothers of the [P]etitioner as to the mental state of the [P]etitioner would not have impeached what he saw, and any alleged improper lay opinion he might have expressed, based on pure speculation, to the [P]etitioner's brothers while crying over his sister's death would not have been admissible.   Even if this court had allowed this testimony from these two witnesses, it would not have made any difference in the outcome of the [P]etitioner's trial.   It would not have impeached any further the testimony of Mr. Clemmons, or any of the other witnesses who were on the scene at the time of the shooting.

The post-conviction court obviously accredited trial counsel's testimony that he did not pursue the issue because he did not think the statements were "strong evidence in favor of" the Petitioner.   The post-conviction court found that the evidence against the Petitioner was strong and that several eyewitnesses saw the Petitioner "wa[]ving or threatening those present" before pointing the gun at the victim's face and shooting her.   Afterward, the Petitioner stated, "I didn't like that bitch no way."   The post-conviction court found that the alleged inconsistent statements would not have impeached Mr. Clemmons' testimony and would not have made any difference in the outcome of the trial; therefore, the Petitioner had failed to establish prejudice.   We agree and conclude that the post-conviction court properly denied the petition for post-conviction relief.

*Waddell*, 2020 WL 1966324, at *5-7.

In the Reply, Petitioner argues that Antoine could have recanted the testimony that Petitioner said, "I did not like that bitch no way."   (ECF No. 16 at PageID 1205.)   But that was Joslyn's testimony.   (ECF No. 11-3 at PageID 161.)   Antoine testified that Petitioner "kind of walked off and stood at a distance and just was like puzzled like" and then ran away.   (ECF No. 11-3 at PageID 278-80.)   Antoine recanting that statement would have not affected Petitioner's case.

Petitioner has not established that his attorney's representation was contrary to *Strickland.* A state court's decision is "contrary" to federal law when it "arrives at a conclusion opposite to that reached" by the Supreme Court on a question of law or "decides a case differently than" the Supreme Court has "on a set of materially indistinguishable facts."   *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000).   The TCCA cited the correct legal rule from *Strickland* and from Tennessee cases applying *Strickland*.   *Waddell*, 2020 WL1966324, at *6.   This is "a run-of-the-mill state-court decision applying the correct legal rule . . . to the facts of a prisoner's case" and, therefore, it does not "fit comfortably within § 2254(d)(1)'s 'contrary to' clause."   *Williams*, 529 U.S. at 406.

19

Petitioner also has not demonstrated that the TCCA's decision was an unreasonable application of clearly established federal law.   The TCCA found that trial counsel thoroughly cross-examined Antoine, noted Antoine's friendship with Petitioner and Antoine's desire to believe that Petitioner did not intend to kill Antoine's sister.   *Waddell*, 2020 WL 1966324, at \*6. The TCCA opined that, regardless of Antoine's comments or opinions about Petitioner's intent, Antoine could not know Petitioner's intent, and the comments were based on pure speculation. *Id.*   Petitioner has not satisfied his burden of demonstrating that the TCCA's rejection of his claims was based on an objectively unreasonable application of *Strickland* or based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.   The Court therefore **DENIES** Petitioner's ineffective assistance claims.

\* \* \* \*

Because every claim presented is without merit, the Court **DENIES** the § 2254 Petition. The § 2254 Petition is **DISMISSED WITH PREJUDICE.**   Judgment shall be entered for Respondent.

## VI.   APPEAL ISSUES

Twenty-eight U.S.C. § 2253(a) requires the district court to evaluate the appealability of its decision denying a § 2254 petition and to issue a certificate of appealability ("COA") "only if the applicant has made a substantial showing of the denial of a constitutional right."   28 U.S.C. § 2253(c)(2); *see also* Fed. R. App. P. 22(b).   The COA must indicate the specific issue or issues that satisfy the required showing. 28 U.S.C. §§ 2253(c)(2) & (3).   No § 2254 petitioner may appeal without this certificate.   28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b)(1).

A "substantial showing" is made when the movant demonstrates that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a

different manner or that the issues presented were adequate to deserve encouragement to proceed

further." *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (internal quotation marks omitted).

> Where a district court has rejected a constitutional claim on the merits, the showing required to satisfy § 2253(c) is straightforward:  The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong. . ..   When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling. . ..

*Slack v. McDaniel*, 529 U.S. 473, 484 (2000).   "In short, a court should not grant a certificate

without some substantial reason to think that the denial of relief might be incorrect."   *Moody v.*

*United States*, 958 F.3d 485, 488 (6th Cir. 2020).   "To put it simply, a claim does not merit a

certificate unless *every independent reason to deny the claim is reasonably debatable*."   *Id.*; *see*

*also id.* ("Again, a certificate is improper if *any* outcome-determinative issue is not reasonably

debatable.").

In this case, there can be no question that the § 2254 Petition is meritless for the reasons

previously stated.   Because any appeal by Petitioner on the issues raised in his § 2254 Petition

does not deserve attention, the Court **DENIES** a certificate of appealability.

Rule 24(a)(1) of the Federal Rules of Appellate Procedure provides that a party seeking

pauper status on appeal must first file a motion in the district court, along with a supporting

affidavit.   However, if the district court certifies that an appeal would not be taken in good faith,

or otherwise denies leave to appeal *in forma pauperis*, the prisoner must file his motion to proceed

*in forma pauperis* in the appellate court.   *See* Fed. R. App. P. 24(a) (4)-(5).   In this case, for the

same reasons the Court denies a certificate of appealability, the Court determines that any appeal

would not be taken in good faith.   It is therefore **CERTIFIED**, pursuant to Federal Rule of

Appellate Procedure 24(a), that any appeal in this matter would not be taken in good faith.   Leave to appeal *in forma pauperis* is **DENIED**.[7]

       **IT IS SO ORDERED** this 16th day of September, 2024.

**_s/John T. Fowlkes, Jr._____**
JOHN T. FOWLKES, JR.
United States District Judge

---

[7] If Petitioner files a notice of appeal, he must pay the full $605 appellate filing fee or file a motion to proceed *in forma pauperis* and supporting affidavit in the Sixth Circuit Court of Appeals within 30 days of the date of entry of this order.   *See* Fed. R. App. P. 24(a)(5).